Johnnie Greene sustained injuries in an automobile accident. His vehicle was involved in a collision with a vehicle driven by Scott James Vance. Greene filed this action against Scott's employer's insurance carrier, Hanover Insurance Company and Massachusetts Bay Insurance Company (collectively, "Hanover"). The trial court held that Hanover did not provide insurance coverage in this case and entered a summary judgment accordingly. Because we conclude that neither Hanover's primary policy nor its umbrella policy provides coverage in this case, we affirm.
Prior to 1993, Hanover had sold two insurance policies to Vance Electrical Contractors, Inc. ("VEC"). The first policy (the "Primary Policy") provided business automobile liability coverage to VEC. Scott Vance was an employee of VEC. He had a driving record that reflected a driver's license suspension for driving under the influence, several accidents, and at least two speeding tickets. Consequently, Hanover refused to provide automobile liability coverage to VEC with respect to Scott. The Primary Policy contained an exclusion endorsement (the "Primary Endorsement") that specifically excluded Scott from coverage under the Primary Policy.
The second policy Hanover sold to VEC (the "Umbrella Policy") provided commercial liability coverage to VEC. The Umbrella Policy contained an endorsement (the "Umbrella Endorsement") that excluded coverage for personal injury and property damage liability arising from the "use or entrustment" of VEC's vehicles.
On January 9, 1993, Greene's vehicle was involved in a collision with one of VEC's vehicles, which was being driven by Scott. Greene was severely injured and Scott was killed. Greene initially sued Scott's estate, VEC, and First of Georgia Insurance Company ("First Georgia"), which had issued a policy that covered Scott, as a result of the automobile accident. Because Hanover's policy specifically excluded Scott from coverage, Hanover did not defend Scott's estate against Greene's claims.
Greene reached pro tanto settlements with VEC and First Georgia. The case proceeded to a nonjury trial against Scott's estate. After a trial on the merits, Greene received a judgment in his favor in the amount of $3,350,000, less a $500,000 set-off ($400,000 paid on behalf of VEC by Progressive Insurance Company and $100,000 paid by First Georgia) for monies previously paid through the pro tanto settlements, leaving an unpaid judgment of $2,850,000.
Because the balance of the judgment had not been paid by Scott's estate, Greene commenced an action pursuant to Ala. Code 1975, § 27-23-2,[1] against Hanover and the administrator of Scott's estate. Greene argued that despite the wording of the Primary Endorsement and the Umbrella Endorsement, both the Primary Policy and the Umbrella Policy covered Scott. Specifically, Greene argued that the Primary Endorsement was inapplicable to Scott because that endorsement incorrectly listed Scott's name as "James Scott Vance" instead of "Scott James Vance." Without objection from Greene, the trial court allowed parol evidence to show that the transposition of Scott's first and middle names was a mistake, and that both parties to the insurance contract (i.e., VEC and Hanover) had intended for Scott to be excluded from coverage. Accordingly, the trial court entered a summary judgment for Hanover.[2] *Page 1356 
On appeal, Greene argues that the summary judgment was improper because, he says: (1) the Primary Endorsement was ineffective to exclude Scott; and (2) the Umbrella Policy provides coverage for Scott. For the summary judgment to be proper, Hanover had to make a prima facie showing that no genuine issue of material fact existed and that it was entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.;Long v. Jefferson County, 623 So.2d 1130, 1132 (Ala. 1993). If Hanover made that showing, then the burden shifted to Greene to present evidence creating a genuine issue of material fact, so as to avoid the entry of summary judgment against him. Long, 623 So.2d at 1132. In determining whether there was a genuine issue of material fact, we must view the evidence in the light most favorable to Greene. Id.
 I. PRIMARY POLICY
Greene argues that the Primary Endorsement is ineffective to cover Scott, for two main reasons. First, Greene argues that parol evidence is not admissible to clarify to whom the Primary Endorsement refers because that endorsement, which names "James Scott Vance" instead of "Scott James Vance," is unambiguous on its face. This argument ignores the well-settled law that parol evidence is admissible to clarify a latent ambiguity. InMedical Clinic Board v. Smelley, 408 So.2d 1203, 1206
(Ala. 1981), we stated:
 "The ambiguity may be latent if the writing appears clear and unambiguous on its face, 'but there is some collateral matter which makes the meaning uncertain; and parol or other extrinsic evidence is admissible to explain or clarify a latent ambiguity.' "
(Quoting Ford v. Ward, 272 Ala. 235, 130 So.2d 380 (1961).) InLamar v. Minter, 13 Ala. 31, 35 (1848), this Court stated that parol evidence was admissible to clarify the latent ambiguity arising from the incorrect listing of Sheppard Spencer Johnson's name in a deed. Specifically, the Court stated that it would not bar parol evidence to show that "Spencer S. Johnson" in the deed was a transposition of the person's first and middle names and was intended to refer to "Sheppard S. Johnson." Id. Likewise, in this case, we will not bar parol evidence to show that the naming of "James Scott Vance" in the Primary Policy is a transposition of the person's first and middle names and was intended to refer to "Scott James Vance."
In support of its motion for summary judgment, Hanover submitted the affidavit of Scott's father, the president of VEC, stating that he and Scott both had understood that Scott was not covered by Hanover. Further, Hanover introduced a deposition of its agent in which the agent said that both Hanover and VEC intended the Primary Endorsement to exclude Scott from coverage. The agent also stated that he had helped VEC obtain coverage from another insurance company, Progressive Insurance Company, solely because Hanover would not cover Scott. Greene failed to produce any evidence to contradict the evidence that the true intent of Hanover and VEC was to exclude Scott from coverage under the Primary Endorsement.[3] Thus, the parol evidence was *Page 1357 
admissible at the summary judgment stage to reform the insurance contract with respect to the transposition of first and middle names, in order to show the true intent of the parties. See National Life Accident Ins. Co. v. Saffold,225 Ala. 664, 665-66, 144 So. 816 (1932) (allowing parol evidence clarifying a woman's name to reform an insurance contract).
Greene argues that even if the parol evidence was admissible, the trial court could not use it to reform the name "James Scott Vance" to "Scott James Vance" because such a reformation would operate to prejudice Greene's right as a third-party beneficiary of the Primary Policy. Greene cites Ala. Code 1975, § 8-1-2, which states:
 "When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value."
(Emphasis added.) Section 8-1-2 codified the equitable remedy of reformation of contracts. American Liberty Ins. Co. v.Leonard, 270 Ala. 17, 21, 115 So.2d 470, 473 (1959). This remedy will not operate to prejudice third parties, such as bona fide purchasers, who acquire rights for value that would be affected by the reformation. Irvin v. Griffin Corp.,808 F.2d 802, 806 (11th Cir. 1987) (interpreting Ala. Code 1975, §8-1-2). The no-prejudice bar will not, however, prevent reformation that will affect the rights of third parties, such as judgment creditors, where those rights were acquired without paying value. See Beasley v. Mellon Fin. Servs. Corp.,569 So.2d 389, 394 (Ala. 1990) ("Reformation will be allowed . . . against . . . judgment creditors"); 66 Am.Jur.2d Reformation ofInstruments § 69 (1973) ("reformation of an instrument may be had in equity as against judgment creditors, since they are not regarded as bona fide purchasers for value"); see also 2 Couchon Insurance 3d § 27:82 (1975) ("insurance policies may be reformed or modified to limit or exclude coverage if such was the intention of the parties, even where the rights of third-party claimants who are not parties to [the] insurance contract are adversely affected"). The trial court properly reformed the Primary Endorsement to reflect the undisputed intention of VEC and Hanover to exclude Scott from coverage. Greene cannot recover under the Primary Policy.
 II. UMBRELLA POLICY
Next, Greene argues that even if the Primary Policy does not cover Scott, Hanover's Umbrella Policy does. Specifically, Greene contends that the general language of the "Excess Insurance" section of the Umbrella Policy provides excess coverage (i.e., coverage in excess of the underlying policy limits) with respect to VEC's employees, including Scott, if the underlying insurance (i.e., Hanover's Primary Policy) is inapplicable.[4] Thus, Greene argues that if we hold *Page 1358 
that the Primary Policy does not cover Scott, then we must hold that the Umbrella Policy does cover Scott as "excess insurance." This argument misses the point. Regardless of whether the Umbrella Policy coverage takes the form of excess or nonexcess coverage, it is still subject to the Umbrella Endorsement's exclusion for injuries arising from the use of automobiles. The Umbrella Endorsement unambiguously provides that the Umbrella Policy does not cover " 'bodily injury,' 'property damage' or 'personal injury' arising out of the ownership maintenance, use or entrustment" of VEC's vehicles.[5] Greene's injury and damage claims fall squarely within this exclusion because they arose from Scott's use of VEC's vehicle. We therefore hold that Greene cannot recover under the Umbrella Policy. See Cook v. Aetna Ins. Co.,661 So.2d 1169, 1170 (Ala. 1995) (holding that an unambiguous exclusion in an insurance policy will be enforced according to its terms).
The judgment of the trial court is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, ALMON, SHORES, HOUSTON, KENNEDY, COOK, and BUTTS, JJ., concur.
[1] Ala. Code 1975, § 27-23-2, reads as follows:
 "Upon the recovery of a final judgment against any person, firm or corporation by any person, . . . for loss or damage on account of bodily injury, . . . or for loss or damage to property, if the defendant in such action was insured against the loss or damage at the time when the right of action arose, the judgment creditor shall be entitled to have the insurance money provided for in the contract of insurance
between the insurer and the defendant applied to the satisfaction of the judgment, and if the judgment is not satisfied within 30 days after the date when it is entered, the judgment creditor may proceed against the defendant and the insurer to reach and apply the insurance money to the satisfaction of the judgment."
(Emphasis added.)
[2] The trial court specifically held:
 "[B]y agreement between the insured, Vance Electrical, and Hanover Ins., the driver of the vehicle in question whether he be called James Scott Vance or Scott James Vance (the son of James K. Vance, President of Vance Electrical), was effectively removed from coverage before the incident in question."
[3] Greene also argues that the Primary Endorsement is ineffective because VEC and Hanover did not execute the endorsement itself. This argument ignores the well-settled rule that a rider or endorsement that is attached to a policy from its inception and that is specifically referenced therein is deemed to be a valid and binding part of the insurance contract.
 "As a general rule, where a rider or slip is physically attached to a policy of insurance contemporaneously with execution, and delivered to the insured as attached, and sufficient reference is made in either the policy or the attached matter to identify the papers as related, the fact that the matter so attached is without the signature of the insurer or its authorized agents will not preclude its inclusion and construction as a part of the insurance contract. Thus, unsigned riders attached to the policy at the time of the delivery to the insured become part of the policy. . . ."
43 Am.Jr. 2d Insurance § 296 (1982). See, e.g., Topeka Tent Awning Co. v. Glen Falls Ins. Co., 13 Kan. App. 2d 553, 556,774 P.2d 984, 986 (1989) (holding that unsigned endorsement specifically referred to by number in main policy was valid and binding part of insurance contract); Anderson v. Aetna Casualty Sur. Co., 432 S.W.2d 151, 153 (Tex.Civ.App. 1968) (stating that unsigned endorsement is valid if attached to insurance policy and referenced therein); Automobile Underwriters v.Camp, 217 Ind. 328, 336-37, 27 N.E.2d 370, 373 (1940) (holding that signing of insurance policy effects a signing of all riders properly attached to policy at time of signing). In this case, the Primary Policy, on page 1, specifically references the Primary Endorsement, by number, as being included in the policy since its inception, and then states, "These declarations together with the business auto policy provisions and endorsements, if any, issued to form a part thereof, complete the above numbered policy." Thus, the Primary Endorsement is a valid and binding part of the Primary Policy.
[4] The Excess Insurance Section of the Umbrella Policy provides:
"1. OTHER INSURANCE
 "This insurance is excess over 'underlying insurance' whether or not valid and collectible, or any other valid and collectible insurance which is specifically purchased by the insured as excess insurance over the insurance provided by this policy.
 "If there is no 'underlying insurance' or valid and collectible insurance available to the insured with respect to an 'occurrence' to which this insurance applies, then this policy shall apply as excess over the Retained Limit stated in the DECLARATIONS except:
". . . .
 "c. When you fail to maintain 'underlying insurance' in accordance with 9. MAINTENANCE OF UNDERLYING INSURANCE in SECTION VI — CONDITIONS.
"2. FAILURE TO MAINTAIN 'UNDERLYING INSURANCE'
 "In the event you fail to maintain 'underlying insurance' as required in 9. MAINTENANCE OF UNDERLYING INSURANCE in SECTION VI — CONDITIONS, this insurance shall not replace such 'underlying insurance' but shall apply as if the 'underlying insurance' were valid and collectible."
(Emphasis added.) Although the Progressive policy appears to provide "valid and collectible" insurance to Scott, thus making the Umbrella Policy coverage "excess" coverage, the Umbrella Endorsement still applies. Therefore, even if the Umbrella Policy coverage is "excess" coverage, it does not apply to Scott's use of a VEC vehicle. See infra note 5.
[5] The Umbrella Endorsement provides:
"COMMERCIAL UMBRELLA LIABILITY
 "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
"FOLLOW FORM — AUTO LIABILITY
 "This endorsement modifies insurance provided under the COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM.
 "This insurance does not apply to 'bodily injury,' 'property damage' or 'personal injury' arising out of the ownership, maintenance, use or entrustment to others of any 'auto.'
 "This exclusion does not apply to the extent that valid and collectible insurance is provided by 'underlying insurance,' except with respect to limits of insurance or limits of liability."
 Greene argues that the following language negates the operation of the Umbrella Endorsement: "This exclusion does not apply to the extent that valid and collectible insurance is provided by 'underlying insurance'. . . ." (Emphasis added.) However, because the "underlying insurance," Hanover's Primary Policy, specifically excluded Scott, the Umbrella Endorsement is effective.